UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

-------------------------------------------------------X

EDWARD R. GALLAGHER,

              Plaintiff,

     v.

DAVID PHILIPPS  and
KENNETH JOHN BRAITHWAITE II, in his
capacity as Secretary of the Navy,

            Defendants.

-------------------------------------------------------X

Civil Action No.  **'20 CV 0993 JLS  BLM**

**COMPLAINT**

**JURY TRIAL DEMANDED**

     Plaintiff EDWARD R. GALLAGHER, by and through his attorneys, Parlatore Law Group,

LLP, states his complaint against Defendants as follows:

## <u>NATURE OF THE ACTION</u>

     1.     This action arises out of the highly publicized and fatally flawed investigation and

prosecution against Navy SEAL, Chief Petty Officer Edward R. Gallagher, USN(ret.) (hereinafter

"Chief Gallagher" or "Plaintiff"), which took place in San Diego, from his arrest on September

11, 2018 and ending in his acquittal on July 2, 2019.

     2.     This highly charged case was infected from the inception with incompetence and

misconduct by investigators and Navy prosecutors.[1]  As problems with the case against Chief

Gallagher began to surface, members of the Department of the Navy had the opportunity to end

this defective prosecution, but instead chose to corruptly attempt to tip the scales of justice in their

---

[1] Unfortunately, *Feres v. United States*, 340 U.S. 135 (1950) currently bars Plaintiff from seeking damages for his wrongful arrest, incarceration, and malicious prosecution because these wrongful actions related to his military service.  Therefore, this lawsuit only seeks damage from the Government based on the statutory violations of the Privacy Act.  However, should there be any subsequent change to the law, Plaintiff reserves the right to assert additional claims against the Government.

favor through an unlawful campaign of leaking Privacy Act protected documents to falsely guide the public narrative (and therefore taint the jury pool).

3.     While their corrupt efforts were initially successful, they soon began to meet with some skepticism, as the leaked documents actually revealed huge gaping holes in the case against Chief Gallagher.  Several media personalities and elected officials also began to support Chief Gallagher, including the Commander-in-Chief, Donald Trump.  As public support began to mount against the Navy's corrupt efforts, they needed a different mouthpiece to spread their false narrative.

4.     The corrupt Navy officials found a willing participant in Defendant David Philipps.[2]  Philipps is a reporter who, despite a lack of any military experience, became "a national correspondent covering veterans and the military" for the New York Times, who claims to focus "largely on the unintended consequences of the wars in Iraq and Afghanistan."  In reality, he has made a career out of falsely depicting combat veterans as broken, violent, drug addicted criminals. Defendant Philipps made a perfect participant because he could add a veneer of apparent independence from the Navy, yet could be relied upon to faithfully parrot and expand upon the false narrative of events.

5.     Navy officials presented David Philipps with a golden egg.  They would illegally provide him with certain protected documents, in clear violation of the Privacy Act and court orders, so that Philipps could write a damning portrayal of Chief Gallagher, with reckless disregard for the truth.  Because President Trump had recently stepped in to order Chief Gallagher released from pretrial confinement, this gave Philipps the additional angle to savage Chief Gallagher while

---

[2] While many journalists received leaked documents from the corrupt Navy officials and many more published false and misleading accounts, Philipps' reporting stands apart from them due to his total disregard of the facts and actual malice in his pursuit to defame and destroy Chief Gallagher's reputation.  Defendant Philipps, unlike the other journalists mentioned, continued his campaign of falsehoods long after having been confronted with the truth.

criticizing President Trump's decision.  As Philipps worked for the New York Times, this anti-Trump angle would allow him to publish his false stories in a national forum with a minimum of fact checking.[3]

6.      The illegally leaked documents were the key to Philipps' false reporting because, despite the fact that Navy officials gave him only a fraction of the actual documents, he touted the fact that he had some documents to lend a false air of credibility to his otherwise vapid and false articles.

7.      Although Defendant Philipps and the New York Times had shown little interest in covering the case for the first seven months that it was pending, other than a single, relatively even handed article published on November 15, 2018, Defendant Philipps' arrangement with Navy officials set him on a mission to write almost exclusively about the prosecution of Chief Gallagher from April 23, 2019 through December 31, 2019.  During this time period, Philipps published at least 28 different articles about Chief Gallagher (including two bizarre articles that Philipps wrote about his own reporting). Only two of these articles were published during the actual trial.

8.      Defendant Philipps' purpose behind these articles was not to actually report news or to inform the public of the truth, but rather to parrot the false narrative of the corrupt Navy officials while advocating a slanted and biased viewpoint against Chief Gallagher.

9.      Defendant Philipps' demonstrated reckless disregard for the truth in publishing these articles and employed a number of methods throughout the articles to avoid reporting the truth, while retaining a veneer of credibility, including:

---

[3] The New York Times has not been named as a co-defendant in this action because Plaintiff believes that Philipps routinely lied to his editors about the accuracy of his information in order to manipulate them into publishing his false stories.  However, Plaintiff reserves the right to amend and add additional parties later, should discovery demonstrate that the New York Times was a knowing and willing participant in Philipps wrongdoing.

a.  Relying upon selectively leaked documents or "anonymous sources" but, when confronted with the fact that numerous other documents exist that demonstrate the contents to be false, he refused to change his story unless the defense would agree to also violate the court's order and illegally leak him documents.

b.  Contacting other witnesses to "verify" facts, but intentionally framing his approach in a manner designed to put these witnesses off so that they will refuse to speak with him.  That way he could mislead his editors by telling them that he had contacted other witnesses, and none refuted the false claim.

10.  As if the constant stream of false articles was not enough, Philipps then teamed up with producers at FX network to produce a "documentary," where he published heavily edited portions of the illegally leaked and privacy act protected documents and videos, along with his own commentary.  The fact that these documents should not have been publicly accessible was not only acknowledged, but actually emphasized by Philipps and FX.  The "documentary" heavily featured NCIS witness interviews which were later completely eviscerated when the witnesses testified in court.  However, rather than show how these statements were thoroughly debunked when subjected to tough questioning, Philipps instead provided his own commentary praising their testimony and even inventing a witness that didn't exist in order to bolster his false narrative.

11.  As a direct result of Defendant Philipps' false reporting, Chief Gallagher and his family, including his young children, have been subjected to serious and disturbing harassment and death threats, for example a message to his daughter reading "Im [sic] gonna come rape you and slice your faggot brothers throat and make your youngest brother watch it all."

12.  After the New York Times finally stopped publishing Defendant Philipps' articles about Chief Gallagher, Defendant Philipps took a leave of absence and is currently writing a book

about Chief Gallagher's case, seeking to profit both financially and by gaining further publicity off of the illegal documents he obtained and the lies he has been peddling to further his personal political agenda.

## PARTIES

13.    Plaintiff Edward R. Gallagher was a Chief Petty Officer and Navy SEAL in the United States Navy and is currently retired.  He was a resident of California until October 2019 and then became a Florida resident.

14.    Defendant Kenneth John Braithwaite II is the Secretary of the Navy ("SECNAV"), named in his official capacity pursuant to 42 U.S.C. § 2000e-16. Defendant does business in the Southern District of California, relevant to this case specifically, through the Naval Criminal Investigative Service ("NCIS"), Naval Special Warfare Command ("WARCOM") and its subordinate commands, and the Region Legal Services Office ("RLSO").

15.    Defendant David Philipps was a journalist for the New York Times until he took a leave of absence to write a book about Chief Gallagher.  He is a Colorado resident.  Defendant Philipps traveled to the Southern District of California to observe pretrial hearings and the trial of Chief Gallagher for his reporting and later for-profit book writing.

## JURISDICTION AND VENUE

16.    This court has jurisdiction over the claims against Defendant Braithwaite pursuant to 5 U.S.C. §552a(g)(1)(D).

17.    This Court has subject matter jurisdiction over the claims against Defendant Philipps pursuant to 28 U.S.C. §1332(a)(1), because Plaintiff and Defendant are citizens of different States and the amount in controversy exceeds $75,000, exclusive of interests and costs.

18.     Venue is appropriate in the Southern District of California pursuant to 5 U.S.C. § 552a(g)(5), as the agency records at issue were situated in San Diego.  Additionally, venue is proper in this District for the claims against Defendant Philipps, pursuant to 28 U.S.C. §§1391(b)(2), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## STATEMENT OF FACTS

### Background

19.     Chief Gallagher was arrested on September 11, 2018 on charges related to his 2017 deployment to Iraq with SEAL Team 7, Alpha Platoon ("ST7-A").[4]  Chief Gallagher pleaded not guilty, but was ordered into pre-trial confinement.

### Initial Leaks

20.     The prosecution of Chief Gallagher was assigned to CDR Christopher Czaplak, a career Navy Judge Advocate General ("JAG") officer assigned to the RLSO.  A 2000 graduate of the U.S. Naval Academy and former submarine officer, CDR Czaplak was an ambitious, career-minded officer, who compensated for his marginal legal skills with a willingness to violate the ethical rules and principles of justice in an effort to win.

21.     Despite the ethical and regulatory prohibitions on Navy JAG prosecutors making statements to the media, CDR Czaplak held regular "off-the-record" press conferences in the hallway of the courthouse.  During these sessions, CDR Czaplak put out a host of intentionally false information for the purpose of illegally and unethically using media coverage to influence the proceedings and the jury venire.

---

[4] The purpose of this lawsuit is not to re-litigate the events which occurred in Iraq, for which Chief Gallagher was acquitted.  Rather, this lawsuit addresses the illegal conduct of Navy officials in leaking protected documents, as well as Defendant Philipps' unlawful conduct in deliberately misrepresenting the contents of those documents and of events which occurred in San Diego.

22.     Although CDR Czaplak stated his initial expectations that there would be a swift guilty plea from Chief Gallagher, this did not occur.

23.     On information and belief, because Chief Gallagher did not quickly plead guilty, members of the RLSO, NCIS and/or WARCOM began illegally leaking documents to various news reporters, expecting that negative publicity would help to pressure Chief Gallagher into taking a plea, as well as to influence any potential jury pool.

24.     Specifically, David Philipps reported receiving about 500 pages of confidential documents from the Navy's criminal investigation, including witness interview summaries and seized text messages, a cache of information Phillips referred to as "the mother lode."

25.     Although the leaks initially did generate the type of media coverage sought by the corrupt Navy officials, the negative coverage did not result in Chief Gallagher pleading guilty. Rather, the increased media profile of the case caused many to begin to publicly question the significant problems with the investigation and charges against Gallagher – significantly several elected officials.

26.     On March 30, 2019, at the urging of several members of Congress, President Trump, in his capacity as Commander-in-Chief, issued an order that Chief Gallagher should be released from the brig and moved to less restrictive conditions.  Media outlets of all political persuasions across the nation covered this major development in the case, but not the New York Times.

27.     On information and belief, Navy officials chose Defendant Philipps to be their chief mouthpiece after Gallagher's release.  Philipps was a natural choice for this position for multiple reasons:

    a.   Philipps had built his career on falsely portraying combat veterans as damaged and dangerous;

    b.   Philipps had a demonstrated history of poor research and a lack of fact-checking anything that might undermine his chosen narrative;

    c.   Philipps, and the New York Times, were all too willing to publish stories that could potentially be used to attack President Trump, regardless of their veracity.

### David Philipps Background

28.    Defendant Philipps is a marginal journalist who has found a niche for himself by falsely painting combat veterans as damaged and violent criminals.  Philipps furthers these negative and bigoted stereotypes by finding kernels of truth that he can then exaggerate and sensationalize in the hopes of gaining journalistic praise.  When he does find a story that meets with any success, he then uses the false narrative that he created under the color of "journalism" for profit by publishing a book based on his "research."

29.    Defendant Philipps began his career at The Gazette of Colorado Springs, where he found success in writing articles demonizing combat soldiers returning from combat in Iraq and Afghanistan.

30.    In 2010, he achieved notoriety for writing articles about the 506th Infantry Regiment return from a deployment to Iraq, which he claimed led to a violent crime wave in Colorado Springs.  He decided to parlay the success of these questionable articles into financial gain by publishing a book entitled "Lethal Warriors: When the New Band of Brothers Came Home."  This book received several critical reviews from members of the unit, who described it as sensationalism and taking the stories of a few individuals to mar the reputation of an entire unit

of combat veterans. Several noted his shoddy research and failure to corroborate any of the claims with witnesses who were actually present for the events he embroidered.

31.     With this early success, Defendant Philipps continuously tried to repeat the same formula, portraying combat veterans as PTSD-addled, violent, criminal and damaged.  While he regularly also blamed the Army and the Department of Veterans Affairs, the base theme remained the same for Philipps – combat veterans are damaged goods and a danger to society.

32.     Defendant Philipps later moved on to the New York Times, where he could continue his campaign to demonize our brave servicemembers on a larger scale.

33.     One of the unfortunate aspects of publications like the New York Times changing from primarily a print publication to an online media provider is that the news articles and opinion pieces are no longer physically separated.   As a result, the line between journalism and opinion/advocacy has gotten extremely blurry.

34.     Defendant Philipps takes advantage of this blurring of the lines to push his political agenda through advocacy articles masquerading as journalism.

**Philipps Acts as an Unofficial Spokesperson for Corrupt Navy Officials**

35.     Soon after President Trump ordered Chief Gallagher released from the Brig, Defendant Philipps began working in earnest to publish articles that would paint Chief Gallagher in the same false negative light that had previously brought him success, while also furthering the false narrative of the corrupt Navy officials that he chose to partner with.  On information and belief, these corrupt officials worked in NCIS, WARCOM, the RLSO, or elsewhere in the Navy.

36.     Philipp's campaign of disinformation began on April 23, 2019, when he published an article entitled "Navy Seals Were Warned Against Reporting Their Chief for War Crimes." The article contained the following false and misleading information[5]:

a.  "Indiscriminately spraying neighborhoods with rockets and machine-gun fire." This was never an allegation against Chief Gallagher and was wholly invented by Philipps.

b.  "The investigation report indicates that a number of other high-ranking SEALs also knew of the allegations against the chief, and did not report them."  This too, is not in the report and was wholly fabricated by Philipps.

c.  "Investigators' interviews with more than a dozen members of Alpha Platoon, included in the Navy's criminal investigation report, as well as other interviews with SEALs, offer a more troubling portrait of the chief."  This was the beginning of what would become a repeated pattern by Philipps of intentionally misrepresenting and inflating the number of witnesses.  At the time, less than ten members of the platoon had even been interviewed, and not all of those interviews supported Philipps' false narrative.

d.  "Their mission was to advise Iraqi forces and provide assistance with snipers and drones, but they said the chief wanted instead to clear houses and start firefights."  This was wholly fabricated by Philipps.

e.  "He routinely parked an armored truck on a Tigris River bridge and emptied the truck's heavy machine gun into neighborhoods on the other side with no

---

[5] This list is not exhaustive.  Much of what Philipps reported were allegations made by some witnesses which were ultimately shown to be false at trial and are therefore not listed here.  Instead, this list focuses primarily on allegations against Chief Gallagher that were never made by any witnesses or investigators, but rather were invented or inflated by Philipps.

discernable targets, according to one senior SEAL." This false claim was never made in any documents or proceedings.

f.   "Another day, two other snipers said, the chief shot an unarmed man in a white robe with a wispy white beard." Once again, Philipps is inventing additional witnesses to buttress stories, as only one witness ever claimed this.

g.   "The report said they spoke repeatedly to the lieutenant's superior, Commander Breisch, and to Master Chief Alazzawi and another Team 7 master chief [about the killing], but were told to 'decompress' and 'let it go.'" However, the investigative report actually shows that this directive to "decompress" and "let it go" was in response to complaints about tactics and that Chief Gallagher had taken Powerbars from their care packages, not in reference to any alleged killing.

h.   "Chief Gallagher had been accused of serious misconduct before. According to the investigation report, Army Special Forces troops serving with him in Afghanistan in 2010 reported that, as a sniper, he had shot through an Afghan girl to hit a man who was carrying her, killing them both." The report actually says that Chief Gallagher had never been previously accused of a law of armed conflict violation and that Chief Gallagher had self-reported a civilian casualty when targeting a high-level Taliban commander. The report is clear that the investigation of the incident was initiated by Chief Gallagher himself, and the incident was determined to be a lawful use of force.

i.   Philipps reported that Chief Gallagher tried to run over a Navy Policy officer in 2014, a completely fabricated story.

37.     Two days later, on April 25, 2019, Defendant Philipps published another article this time about his own reporting.  In this article he revealed his own bias and intended narrative: "My first hunch was that it could have been some kind of psychotic break, caused by repeated deployments.  Maybe in the details I could find something telling about the professionals who shoulder our nation's relentless wars and their lack of mental health resources."

38.     That same day, April 25, 2019, Defendant Philipps appeared on the New York Times podcast, The Daily, to discuss the case.  Like his article, he disclosed that he was hoping to cover Chief Gallagher as a mental health issue: "And my first inclination was maybe so many deployments had left him with post-traumatic stress disorder or a traumatic brain injury or all of the above. And if that was true, I thought that was a really important story to tell. So what I did is I reached out to his family. I spoke to his brother, I spoke to his wife, and I spoke at length about his record, trying to parse out — were there things that had happened in the past that might contribute to this idea that he was injured, and that the SEALs had failed to see that?"

39.     Also, that same day, April 25, 2019, Defendant Philipps appeared on the show Democracy Now, giving an incredibly slanted interview where he painted a one-sided picture of Chief Gallagher by disclosing only the negative facts and evidence that his sources wanted disclosed.

40.     Philipp's efforts to paint Chief Gallagher in a false negative light were largely fueled and supported by what Philipps called "the mother lode," the selective leaks of information to Philipps by Navy officials in violation of the Privacy Act, as well as court orders.

41.     On information and belief, because his employer, the New York Times, and particularly its General Counsel, David McCraw prided itself on journalism serving as a natural counterbalance to government corruption, Philipps had to lie to his editors to ensure that they

would permit him to use the New York Times as a platform to carry the water for corrupt government officials.

**Leak Investigation and Unlawful Surveillance**

42.     Amid growing complaints from Chief Gallagher and his legal team about the prevalence of illegal leaks by corrupt Navy officials, leaks that were solely designed to hurt Chief Gallagher and jeopardize his right to a fair trial, the military judge directed the RLSO and NCIS to investigate and stop the leaks.

43.     In a classic case of the wolf guarding the henhouse, NCIS and the RLSO performed only a cursory investigation before absolving themselves and repurposing the investigation as an opportunity to spy on Chief Gallagher's defense attorneys and a member of the media.

44.     At one point, emails demonstrated that CDR Czaplak intentionally directed NCIS investigators to investigate defense attorneys to find information that would assist him in denigrating them to the Court.

45.     Although NCIS investigators carried out Czaplak's corrupt directives, they yielded no results because all of the corrupt and illegal activities were coming from Czaplak's office at the RLSO, NCIS, WARCOM, and other elements within the Navy.

46.     NCIS personnel and CDR Czaplak then hatched a corrupt plan to install tracking software on emails sent to defense counsel and to the editor of the Navy Times, one of the outlets that was covering the case, but that had begun to look skeptically at the Government's claims and fulfill the press' role as a natural counterbalance to corruption.

47.     On information and belief, CDR Czaplak's corrupt plans were known and approved, at least tacitly, by the highest levels of the Navy JAG Corps, including then-CAPT[6]

---

[6] Rather than hold Sharp accountable for his actions, the Navy promoted him to Rear Admiral and allowed him to retire as a one-star admiral.

Gary Sharp, Chief of Staff, Region Legal Service Offices ("COS RLSO"), the Navy's chief prosecutor.

48.     NCIS and RLSO's corrupt plan was quickly exposed, to universal outrage from all who value constitutional principles.  Their illegal actions drew condemnation from both sides of the political aisle, as one of the unique circumstances that draws the ACLU, the Committee to Protect Journalists, and the Trump administration together.

49.     However, while most media sources were upset at the Government's direct assault on a journalist and the first amendment, Defendant Philipps instead went into damage control mode to lament how this development could potentially derail his sources' designs to put Chief Gallagher in jail.

50.     On June 3, 2019, Philipps published an article entitled "Judge Removes Prosecutor in Navy SEAL's War Crimes Court-Martial," where he feebly attempts to defend CDR Czaplak's indefensible conduct while repeating his false claims against Chief Gallagher:

        a.     "In court, the prosecutor did not speak."  While not defamatory in itself, this curious statement demonstrates how completely untethered Philipps reporting is from the truth, considering that CDR Czaplak gave an extensive argument defending the prosecution's conduct in this case.

        b.     "Hoping to track down the source of the leaks, Commander Czaplak, working with Naval Criminal Investigative Service agents, sent emails to defense lawyers in May that had hidden monitoring software embedded in them, allowing prosecutors to track who forwarded and who received the emails, court documents show."   Here, Philipps acts as an apologist for CDR Czaplak,

ascribing a supposedly virtuous motive to his illegal conduct despite the fact that that "motive" was thoroughly rejected by the Court.

c.   "Leaked investigative documents in the Gallagher case include detailed descriptions from SEALs in the chief's platoon of their leader indiscriminately spraying civilian neighborhoods in Iraq with rockets and heavy machine gun fire…"   As discussed above, these allegations were fabricated by Philipps alone and are contained nowhere in the investigative file.

**Trial Coverage**

51.   Defendant Philipps attended court every day of the trial and personally observed the entire proceedings.

52.   On the first day of trial, Philipps published an article entitled "Navy SEAL Edward Gallagher Goes on Trial for War Crimes."   This article, intended to set the stage for the trial, contained additional false and misleading statements:

a.   "They said he… ordered SEALs to fire rockets and machine guns at neighborhoods with no clear targets."   This is a recycling of Philipps' prior false claims, although curiously modified to indicate that Chief Gallagher ordered others to perform these tasks instead of performing them himself.

b.   "Snipers told investigators that they saw Chief Gallagher shoot a school-age girl in a flower-print hijab who was walking with other girls on a riverbank." In reality, only one witness claimed to see a girl get shot, but initially thought she was shot by ISIS.   It was only a year after the fact that he changed his story to blame Chief Gallagher, while admitting that he did not see Gallagher as they were in different buildings at the time.

c.   "However, at least one SEAL who initially told investigators he saw the stabbing has apparently recanted."  This is the first instance where Philipps attempts to misrepresent the statements of witness "V."[7]  In reality, V never supported the Defendants' false version of events and told investigators from the beginning that he did not see Chief Gallagher stab the terrorist in the neck, but rather claimed that he saw him stick him in the abdomen post-mortem as a "dead check" to see if the terrorist was still alive.

d.   "The Gallagher case was rocked in May by revelations that the Navy's lead prosecutor, Cmdr. Christopher Czaplak, and agents of the Naval Criminal Investigative Service had tried to identify the source of leaks by sending emails embedded with hidden tracking software to defense attorneys and a journalist for Navy Times." Again, Philipps acts as an apologist for CDR Czaplak in repeating the debunked and laughable claim that this was an effort to identify the source of leaks.  What makes this claim all the more outrageous is that Philipps himself is the recipient of leaked documents and knows the source, which is likely CDR Czaplak or the NCIS agents that he falsely defends.

53.    While other outlets filed daily articles about the proceedings, Defendant Philipps declined to do so despite his presence in the courtroom and his extensive pre-trial focus on the case.  On information and belief, this was because the majority of the daily events and crumbling of the case against Chief Gallagher did not fit Defendants' chosen narrative.

54.    On information and belief, instead of filing regular, timely articles based on courtroom proceedings, Philipps used his daily presence in the courtroom to build a false sense of

---

[7] For the privacy of this individual, who was never called as a witness at trial and still serves on active duty as a SEAL, he is being identified by his initial, V.

credibility to push his continuing false stories past his editors without the need for corroboration or fact-checking.

55.    The only two articles that he published during the trial were focused on undermining the credibility of exonerating testimony in favor of Chief Gallagher, while continuing to highlight intentionally misleading or untruthful observations and pieces of the proceedings.

56.    On June 20, 2019, David Philipps published an article entitled "Navy SEAL War Crimes Witness Says He Was the Killer." In this article, Defendant Philipps made the following false or misleading statements:

      a.  "'You can stand up there, and you can lie about how you killed the ISIS prisoner so Chief Gallagher does not have to go to jail,' a Navy prosecutor, Lt. Brian John, told him.  Special Operator Scott then looked over from the witness stand toward Chief Gallagher, whose wife and two of his children were in the courtroom. 'He's got a wife and family,' Special Operator Scott said. 'I don't think he should spend the rest of his life in prison.'" In reality, these two statements were not related to one another.  SO1 Scott's actual answer to LT John's question was "No.  If I lied, I would lose my grant of testimonial immunity."  The quoted answer was to an entirely different question asked by counsel for Chief Gallagher in re-cross about whether he was now telling this story because he didn't "want an innocent man to go to jail?"  SO1 Scott answered "That, and I believe I've always gotten along with Chief Gallagher. He's got a wife and a family.  I don't believe he should be spending his life in prison."

b.   "In the military court in San Diego this week, several SEALs said that since reporting their chief's actions, they had received online death threats, and at least one had begun carrying a concealed weapon."  However, at this point, the SEALs had testified that they had *not* received any death threats.  Craig Miller testified that he had applied for a concealed carry permit with the assistance of NCIS Agent Joseph Warpinski, but not that he had seen any death threats.

c.   "Chief Gallagher then left the battle area to drive to a command post about two miles away." Beginning with this article, Philipps continuously inflated the distance that Chief Gallagher was from the command post, which was only about 1500 meters.  Moreover, Philipps repeatedly makes it seem as if Chief Gallagher left the battle area to get to the ISIS prisoner, while omitting the fact that the battle had ended and they were ordered back to the compound by their task force commander.

57.   On June 26, 2019, Defendant Philipps published an article entitled "Navy SEAL Whose Testimony Roiled War-Crimes Trial May Face Perjury Charge." In this article, Philipps clearly went on the defensive to help promote the narrative of his corrupt Navy sources.  In this article he made the following false or misleading statements:

a.   "Special Operator Scott, who made eye contact with Chief Gallagher and with Timothy Parlatore, the chief's defense lawyer, several times during his testimony, seemed unshaken by the accusation."  Although Philipps has attempted to paint a false picture of SO1 Scott's testimony, he was in the back row, behind Chief Gallagher and his attorneys, separated by several rows of

people and the backs of their heads and not in a position to possibly make this theatrical (and false) observation.

b. "When a prosecutor asked Special Operator Scott in court last week why he had waited until he was on the stand to assert that he had killed the captive, the medic replied that Chief Gallagher had a wife and family, and said, 'I don't think he should spend the rest of his life in prison.'"  As discussed above, Philipps intentionally cobbled together separate questions and answers in an effort to intentionally misrepresent SO1 Scott's testimony.  In reality, the answer was given to a question by defense attorneys about why he had chosen to tell the full truth, to which he acknowledged that Chief Gallagher was innocent and that he should not spend the rest of his life in prison.

c. "Navy investigative documents obtained by The New York Times show that investigators had asked Special Operator Scott a number of times, in the presence of other agents and lawyers, to detail the cause of the captive's death."  However, the documents show no such exchanges, as investigators never discussed the cause of death.

d. "The Navy official said that Naval Criminal Investigative Service agents and Navy prosecutors would be able to testify in a perjury trial that the medic had repeatedly given them a very different account of the captive's death: that he saw Chief Gallagher stab the captive two or three times, not once; that he saw blood rushing from the stab wounds; that the wounds were fatal; and that Special Operator Scott had watched the captive stop breathing and die from those wounds."  Even if Philipps' alleged source made these statements,

19

Philipps was fully aware that this was untrue, as SO1 Scott stated from the beginning that there was no blood, never discussed whether the wounds were fatal or the cause of death, and was equivocal at best on the number of stab wounds; facts that were contained in the improperly leaked records reviewed by Philipps.

e.   "In court, some of the SEALs said they had received threats and had begun carrying weapons for self-defense." As noted above, this is demonstrably false.

f.   "[Dalton Tolbert] told the court that he believes that he will probably be cut from SEAL Team 6 because of his part in the trial and the public attention it has drawn." Actually, SO1 Tolbert was responding to the fact that he threatened to burn down the courthouse, and stated in text messages that his new teammates at SEAL Team 6 enjoy killing civilians – a claim that he admitted he had no knowledge of.

### After the Acquittal

58.   Immediately after Chief Gallagher was acquitted, Defendant Philipps went into overdrive to protect and rehabilitate the reputations of his corrupt government sources and his own by publishing a steady stream of articles and public statements attempting to falsely retell the events of the trial and argue that he was right and the jury was wrong.

59.   On July 2, 2019, the day of the verdict, Defendant Philipps published an article entitled "Navy SEAL Chief Accused of War Crimes is Found Not Guilty of Murder."  In this article, Defendant Philipps attempted to falsely paint the acquittal as being against the weight of the evidence be repeating all of the accusations made by prosecutors, while ignoring the cross-examinations and defense witnesses that completely undermined the prosecution's case, in spite

of the fact that Philipps himself had been present in court for each of those witnesses.  For example, Philipps completely omitted the blockbuster moment where the Government's own medical examiner expert witness testified that he could not form any opinion as to the cause of death. Additionally, Philipps made the following false or misleading statements:

a.  "Some of the platoon members who spoke out were called traitors in a closed Facebook group and were threatened with violence.  In court, some said they had started carrying weapons for self-defense."  In reality, no such violent threats were ever made and, when pressed, the witnesses admitted that they had seen no such threats.  Additionally, a single witness, Craig Miller, was cross-examined on the fact that he had previously been a participant in a New Mexico Sheriff's "badge mill," where he received police credentials with no training, so that he could carry a pistol and that, after that program was shut down by authorities, he lied to the San Diego Sheriff's Office about receiving death threats so that he could fraudulently obtain a California carry permit.

b.  "The SEAL command initially downplayed the platoon members' reports about the chief, and did not start an investigation of the alleged crimes for more than a year, allowing the trail of evidence to grow cold."  However, the evidence demonstrated that the reports were not made until well after the platoon had returned home from deployment and that, although they had plenty of opportunities to take photos or evidence of the body, the accusers declined to do so, instead posing for their own trophy photos with the dead terrorist.

c.  "And a key witness changed his story on the stand to favor Chief Gallagher…His testimony also deviated in other significant ways from what he

had told investigators before trial."  This became a familiar false refrain from Philipps, repeated often, but always without elaboration, as SO1 Scott's testimony did not deviate from his prior statements in any way.  The only difference is that, once he received immunity, he could provide additional information that prosecutors had inexplicably failed to ever ask from him.  He even told prosecutors on prior occasions that the prisoner had asphyxiated, but they never asked any follow up questions about the cause of death.  Notably, in re-direct, the prosecutor was unable to confront SO1 Scott with a single prior inconsistent statement.

    d.   "SEALs testified that after giving the fighter first aid, Chief Gallagher, a trained medic, stabbed the fighter repeatedly in the neck…During two weeks of testimony, two SEALs testified that they had seen Chief Gallagher stab the captive in the neck for no clear reason."  In an effort to bolster his argument, Philipps continuously inflates the number of witnesses, even though there was only a single witness, Craig Miller, who ever testified that he saw any stabbing in the neck.

60.    On July 3, 2019, the day after the verdict, Defendant Philipps published an article entitled "Acquittal of Navy SEAL May Deter Others From Reporting Crimes, Some Officials Worry."  In this article, Defendant Philipps laments Chief Gallagher's acquittal and quotes numerous alleged anonymous sources opining as to the potential effects of this verdict.  As always, Philipps refuses to recognize the possibility that the jury found Chief Gallagher not guilty because he is, in fact, not guilty.

61.     On July 8, 2019, a few days after the verdict, Defendant Philipps went on a podcast, "The Daily," to give a synopsis of the trial.  Again, he used the opportunity to promote the false narrative of the corrupt Navy officials and misrepresented the events of the trial while failing to disclose any of the evidence that undermined that theory.  In trying to make the case that the jury got it wrong, he made the following false statements:

    a.   "SEALs are engaged in that battle.  But people testify that when he hears it's actually an ISIS captive, he says, no one touch him. He's mine. And he then drives two or three miles back, away from the fight, to their outpost to see this fighter.  Everybody agrees about that."  Except nobody agreed about that. Evidence showed that Chief Gallagher was in a position 1500 meters forward, not two to three miles and they were called back by the task force commander because the battle was over.

    b.   "But then two SEALs testify that Chief Gallagher, for no clear reason, for reasons that even when pressed on the stand, they couldn't offer any insight into, Chief Gallagher pulls out this custom knife and stabs the fighter repeatedly in the neck." As he has done repeatedly, Philipps invented an additional witness that does not exist.  Only Craig Miller made this claim.

    c.   "But when [SO1 Scott] gets to the part where the chief suddenly stabs the fighter in the neck, he starts to hem and haw. Where he had told investigators he stabbed him two or three times, he says, well, I only saw him stab him once. And I'm not sure how deep it went. I didn't even see any blood. I don't think those wounds would have killed him. He just seemed stable after that. And then I waited around until he asphyxiated.   And the prosecution starts getting

flustered.  And the prosecutor sat down from his examination, clearly perplexed about what was happening."  None of this was inconsistent with his pretrial statements to investigators, other than changing his imprecise "probably 2-3 times" to the more precise statement that it was definitely once, but he didn't want to speculate about how many more.  Otherwise, the prosecutor sat down satisfied that he had gotten the expected testimony.

    d.   "The first thing that comes in my head is this is not supposed to happen. This is what happens in every TV court show you've ever seen. But it never actually happens in court. This is the type of perjury, take the fall at any cost type of behavior you see in a gang trial, not in the trial of elite commandos. And so everybody in the courtroom was shocked."  Philipps makes no room for the fact that SO1 Scott is telling the truth, rather stating emphatically that it was "perjury."

62.    On October 18, 2019, Defendant Philipps published an article entitled "The Navy Wants to Push Out Problem SEALS.  But Trump May Get in the Way."  In this article, Defendant Philipps advances the outrageous argument that the Navy leadership should be permitted to impose additional punishment upon Chief Gallagher beyond that which the court imposed.  Philipps then laments the fact that Navy leaders are afraid to exceed the Court's punishment based not on an understanding of justice, but rather a fear that the President may reverse their decisions.  Interestingly, Philipps also seems to reveal the identity of one of his sources as RADM Collin Green.  Additionally, Philipps made the following false or misleading statements:

    a.   "Special Operator Scott changed his story on the stand and prosecutors canceled the testimony of other witnesses, fearing they would do the same."  As

discussed above, SO1 Scott did not change his story. However, the true
falsehood here is that there was only one other potential witness who was not
called, V, likely because his testimony was unhelpful to the prosecution's case,
not any fear that he may change his story.

      b.  "Admiral Bolivar replied in a letter Aug. 1 that she found the chief's conduct
reprehensible and had no intention of suspending his sentence."  However,
Admiral Bolivar made no such inflammatory statements, which were entirely
fabricated by Philipps.  Instead the letter restated Chief Gallagher's request,
cited certain sections of the regulations, and then simply stated "I find that the
information provided in reference (a) fails to satisfy this burden."

63.    On October 19, 2019, Defendant Philipps published an article entitled "I Was
Reporting on an Outspoken Navy SEAL.  His Colleagues Were Anything But."  In this article,
Defendant Philipps again tries to extoll his own reporting while bemoaning the fact that none of
the SEALs would agree to be interviewed by him.  However, this article was really just a cover for
the fact that Philipps intentionally did not verify his reporting through speaking with additional
witnesses.  On information and belief, Philipps used different approaches to SEALs, depending on
whether he expected them to support his narrative or not.  Those that were sympathetic had been
quoted extensively and anonymously.  However, he took a very different approach to contacting
those that would undermine his reporting, sending lengthy text messages that were designed to
cause the witnesses not to want to speak with him.  Later, when one former SEAL officer seemed
willing to engage in an exchange with  Philipps, Philipps started using his Twitter account to
falsely accuse this officer of covering up war crimes and subtly threaten that this false claim would
also become part of his reporting.

64.     What this article also reveals is particularly dangerous conduct by the corrupt Navy officials to compromise operational security and the privacy rights of several other current and former SEALs by providing Defendant Philipps with a complete list of other SEALs that Chief Gallagher had deployed with on prior occasions so that he could contact them as well.

65.     On October 29, 2019, Defendant Philipps published an article entitled "Navy Reduces Punishment for SEAL in War Crimes Case" about the Chief of Naval Operations, ADM Mike Gilday's decision to modify the imposed sentence to limit the rank reduction.  While much of the article recycles the same information as before (i.e. the false claim that "Admiral Bolivar said that she found Special Operator Gallagher's behavior after his trial reprehensible" and that "a star witness changed his story"), he also outright invented an additional witness:

    a.   "When a wounded Islamic State fighter was brought in, three SEALs told investigators, they saw their chief stab the fighter in the neck, killing him."  As discussed above, only Craig Miller made this claim and Philipps had previously falsely invented an additional witness.  This new claim raised Philipp's imaginary witness count to two.

**Trident Review Board**

66.     On Friday, November 15, 2019, President Trump issued an order to restore Chief Gallagher's rank, allowing him to retire with the full pension he had earned.

67.     That following Monday, November 18, 2019, RADM Green decided that, despite the fact that Chief Gallagher was now set to retire and his punishment settled, he wanted to punish him further with a symbolic removal of his SEAL Trident pin.

68.     On information and belief, RADM Green and the WARCOMs Public Affairs Officer, CAPT Tamara Lawrence, huddled with Defendant Philipps to ensure that he was

26

provided with full access to Chief Gallagher's private information so that he could provide extensive reporting to further Green's corrupt efforts to further hurt Chief Gallagher.

69.     While Philipps had published only three articles during the entire pendency of the two week trial, mostly in an attempt to undermine the credibility of SO1 Scott's testimony, he published nine articles over the one week that RADM Green pursued his ultimately failed attempt to remove Chief Gallagher's Trident.

70.     The thrust of these articles, which were largely repetitive, was to reassert the allegations that the jury rejected, without any discussion of the significant evidence countering those initial allegations that was presented in court, while implying that the jury got it wrong. Philipps served as a mouthpiece for RADM Green in extolling his self-virtuous claims of restoring good order and discipline, while detailing his mindset and actions as he maneuvered around his superior officers to further punish Chief Gallagher.

71.     Ultimately, Philipps' portrayal of RADM Green was to set him up as a member of the resistance who allegedly was trying to do the right thing in spite of the New York Times' biggest adversary – President Trump.  At the same time, Philipps advocated that President Trump was overstepping in his involvement in the military justice system.

72.     On November 19, Defendant Philipps published an article entitled "Navy Wants to Eject From SEALs a Sailor Cleared by Trump, Officials Say."   In this article, he made the following false or misleading statements:

> a.  "The move could put the SEAL commander, Rear Admiral Collin Green, in
> direct conflict with President Trump, who last week cleared the sailor, Chief
> Petty Officer Gallagher, of any judicial punishment in the war crimes case."
> This statement, along with the very title of the article completely misrepresent

the President's orders and the punishment that Chief Gallagher received.  The only thing the President did was to re-promote Chief Gallagher so that his pension would not be reduced.  This was not applied retroactively to the months that he had been paid at the reduced rank or to the fines that he paid, the jail time he was sentenced to and served, or the lifetime collateral consequences of a General Court Martial conviction.  Despite being reminded of this fact repeatedly, Philipps continued to push this false claim about President Trump "clearing" Chief Gallagher.

b.  **"In court testimony, multiple SEALs in the platoon said that they reported one killing the day it happened, and several times after that as well, but that the platoon commander, Lieutenant Portier, did not forward the report up the chain of command as required by regulations. Lieutenant Portier was criminally charged with failing to report the murder; he denied the charges, and they were dropped after Chief Gallagher was acquitted. Commander Breisch was the troop commander over Chief Gallagher and Lieutenant Portier in Iraq. SEALs in the platoon testified that they told him repeatedly about the killings after the deployment, but were told to 'decompress' and 'let it go,' according to a Navy investigation. Commander Breisch was not charged."**  As discussed above, this is not true.  LCDR Breisch did tell the platoon members to decompress and let it go related to complaints that Chief Gallagher had eaten the Powerbars from the platoon care packages but the allegations of killings did not come until much later.

73.     On November 20, 2019, Defendant Philipps published an article entitled "As Admiral Moved to Expel a Navy SEAL, He Kept an Eye on Trump."  This article is mostly a self-serving profile of RADM Green, along with further repetition of the debunked initial allegations, and criticism of the President to further a political narrative.  In it, Philipps does exaggerate the President's involvement in the case, saying "Mr. Trump intervened in the case several times in the Chief's favor," when in fact his only involvement in the trial was to order Chief Gallagher released from the brig.

74.     On November 21, Defendant Philipps published an article entitled "Trump Reverses Navy Decision to Oust Edward Gallagher from SEALS."  In this article, Philipps repeated the false claim that "Mr. Trump intervened several times in his favor," implying that this may be why Chief Gallagher was acquitted, rather than the evidence presented in court.

75.     On November 23, 2019, Defendant Philipps published an article entitled "Navy is Said to Proceed with Disciplinary Plans Against Edward Gallagher."  In this article, he again repeats the debunked allegations against Chief Gallagher while advocating for corrupt Navy officials who were intent on moving forward with their plan to impose additional punishment on Chief Gallagher, in violation of the orders of the President.

76.     On November 24, 2019, Defendant Philipps published an article entitled "Esper Demands Resignation of Navy Secretary Over SEAL Case."  In this article, he again repeats the same debunked allegations against Chief Gallagher.

77.     The same day, Defendant Philipps published a second article entitled "Who is Edward Gallagher, the SEAL the Navy Wants to Expel." In this article, Philipps again rehashes the same allegations that Chief Gallagher was acquitted of while implying that the jury got it wrong.  In doing so, he again engages in exaggeration, falsely claiming that "after deliberating for

29

about two hours, the jury acquitted Chief Gallagher" rather than the two days that they actually deliberated.

78.    On November 25, 2019, Defendant Philipps published an article entitled "How SEALs and Veterans View the Trump-Navy Tussle Over Gallagher," where he publishes a collection of opinions from various veterans and SEALs.  While this article does not contain anything defamatory, it is revealing how the opinions of the community are largely shaped by the false narratives put out by Philipps and the corrupt Navy officials, rather than the actual facts of what occurred in the courtroom.

79.    On November 27, 2019, Defendant Philipps published an article entitled "Navy Drops Efforts to Expel from SEALs 3 Officers Linked to Gallagher."  In this article, he repeats the same debunked allegations against Chief Gallagher to lament the fact that the Navy is being prevented from unlawfully retaliating against him or his immediate superiors who were also the subject of discredited allegations.

80.    On November 30, 2019, Philipps published an article entitled "Trump's Intervention in SEALs Case Tests Pentagon's Tolerance."  This article contained so many misstatements of fact, material omissions, and opinions masquerading as facts that Chief Gallagher, through counsel, sent Defendant Philipps a request for him to correct these inaccuracies with a red-lined version of the article.[8]  Defendant Philipps never responded to this request or made any corrections.

---

[8] A copy of this is annexed hereto at Exhibit "A."

**After Chief Gallagher's Retirement**

81.    On December 4, 2019, Chief Gallagher retired from the Navy.

82.    On December 27, 2019, Defendant Philipps published an article entitled "Anguish and Anger From the Navy SEALS Who Turned in Edward Gallagher."  This article was printed as a companion to Philipps producing a documentary on FX entitled "The Gallagher Effect."  In this article, he made the following false or misleading statements:

    a.    "They offer the first opportunity outside the courtroom to hear directly from the men of Alpha platoon, SEAL Team 7, whose blistering testimony about their platoon chief was dismissed by President Trump when he upended the military code of justice to protect Chief Gallagher from the punishment."  Philipps intentionally and misleadingly presents the initial, unsworn statements of these witnesses, while refusing to report on how their actual testimony at trial completely fell apart.  Rather than quote any of their trial testimony, Philipps instead mischaracterizes it as "blistering" while making it seem as if the President ignored their testimony.

    b.    "The video interviews and private group text conversations obtained by The Times do not reveal any coordinated deception among the SEALs in the chief's platoon. Instead, they show men who were hesitant to come forward, but who urged one another to resist outside pressure and threats of violence, and to be honest."  In fact the text messages, which were presented to the jury showed that the witnesses had bound together in a self-described "sewing circle" to get their stories straight, with one witness openly admitting that he was willing to lie.

c. "The platoon members told investigators that they tried repeatedly to report what they saw, but that the chain of command above them was friendly toward Chief Gallagher and took no action. Finally, in April 2018, they went outside the SEALs to the Naval Criminal Investigative Service. Chief Gallagher was arrested a few months later." In fact, records show that it was their chain of command that took the allegations to NCIS in April immediately after the witnesses came forward.

83. The FX show was similarly edited in a manner designed to mislead the public. Initial witness interviews were presented as fact, without any of the context about how those witnesses fell apart on the stand. Craig Miller's demonization of Chief Gallagher as "freaking evil" was never given the context of his cross-examination where he denied disliking Chief Gallagher and admitted that these statements had been an exaggeration.

84. While riddled with inaccuracies, material omissions, and Philipps' personal bias and interpretations, Philipps' most outrageous false statements, which were relied upon by the public in condemning Chief Gallagher were:

a. "And then, Eddie Gallagher's trial starts. The prosecution starts with their witnesses. Did you see him stab him? Yes, I did. Another SEAL comes up. Did you see him stab him? Yes, I did. The prosecutors present the evidence. They had a good case." Philipps explains before SO1 Scott takes the stand. Once again, Philipps completely invents a witness, as Craig Miller is the only witness who testified consistent with Philipps chosen narrative.

b. "Corey Scott changed his story on the stand. What Corey Scott had told investigators multiple times beforehand is [he stabbed him probably two or

three times]… The prosecutor sits down without having gotten any of the testimony he expected."  In fact, the only difference between what was expected and the actual testimony was that SO1 Scott said he was sure it was one stab, but didn't want to speculate as to how many additional stabs, if any, there were.

c.  Philipps misleadingly edited together the audio of SO1 Scott's testimony to match his prior false articles by juxtaposing  a question from the prosecutor about whether SO1 Scott could lie with SO1 Scott's response to a different question from defense counsel, in which he said that Chief Gallagher has a family.

d.  "This is not the story of one Chief who killed someone, it's the story of six or seven guys who said like no, we're gonna stand up and do the right thing."  Again Philipps stated this as fact, while ignoring that Chief Gallagher was acquitted and the testimony of a few disgruntled members of the platoon was discredited.

85.  On December 31, 2019, Defendant Philipps published an article entitled "From the Brig to Mar-a-Lago, Former Navy SEAL Capitalizes on Newfound Fame."  That article was also so hopelessly riddled with falsities that Chief Gallagher again, through counsel, sent Philipps a red-line edited version by email with a request for corrections.[9] Philipps' editors reluctantly made some changes, after much back and forth, during which it became clear that the only fact-checking done was to rely upon Philipps' alleged first-hand knowledge of the trial.

---

[9] A copy of this is annexed hereto at Exhibit "B."

## FIRST CAUSE OF ACTION: UNLAWFUL DISCLOSURE IN VIOLATION OF THE PRIVACY ACT

### (Against Defendant Braithwaite)

86.     Plaintiff repeats and realleges all of the allegations set forth above as if fully alleged herein.

87.     Defendant, though various members of the Department of the Navy, willfully and intentionally disseminated information protected by the Privacy Act concerning Chief Gallagher to the public, including specifically to David Philipps.  This information included but is not limited to dozens of witness interview summaries and hundreds of seized text messages between Chief Gallagher and other Navy SEALs.

88.     The information disseminated was maintained within one or more Privacy Act systems of records retrievable by use of Chief Gallagher's name or by some identifying number, symbol, or other identifying particular assigned to Chief Gallagher.

89.     Defendant did not obtain prior written consent from Chief Gallagher as required by 5 U.S.C. §552a(b) and Chief Gallagher did not make a written request for such disclosure.

90.     No exception to the request or consent requirements of 5 U.S.C. § 552a(b) apply that would permit disclosure of this information to David Philipps or any other media personnel.

91.     As a result of Defendants' violations of the Privacy Act and unlawful disclosure of Chief Gallagher's private information to David Phillips, Chief Gallagher has suffered significant adverse effects, including significant mental and emotional anguish, being subject to ridicule and humiliation, receiving death threats to him and his family, including graphic messages sent to his teenage daughter such as one that read "Im [sic] gonna come rape you and slice your faggot brothers throat and make your youngest brother watch it all," being forced into the national spotlight in a negative light and subject to a continuing barrage of biasedly negative publicity, and

34

significant tarnishing of his reputation.  Chief Gallagher has suffered actual damages from these effects in the form of lost speaking engagements and employment opportunities, time and travel expenses to combat the false narrative that resulted from the leaked information, additional time away from work for his wife and travel expenses during the extended time for trial resulting from the "investigation" into the leaked information and pursuant Constitutional violation on the part of the prosecution, the cost of therapy for Chief Gallagher's daughter, time and expense of counseling for the entire family,  the thousands of additional dollars expended in legal fees and expenses during his criminal trial attributable to the additional time and effort caused by the leaked information, and the significant money expended in furtherance of this lawsuit to stop the continuous defamatory use of the leaked information and to recover for the damage it caused the Gallagher family.

## SECOND CAUSE OF ACTION: LACK OF ACCOUNTING UNDER THE PRIVACY ACT

### (Against Defendant Braithwaite)

92.     Plaintiff repeats and realleges all of the allegations set forth above as if fully alleged herein.

93.     Defendant willfully and intentionally failed to keep an accurate accounting of the date, nature, and purpose of each disclosure made to David Philipps and other members of the media, or to retain any such accounting for at least five years after the disclosure as required by 5 U.S.C. §§ 552a(c)(1) and (c)(2).

94.     Because of Defendant's failure to keep an accurate accounting, an "investigation" was launched to determine where the disclosed information was coming from., during which NCIS and  CDR Czaplak installed tracking software on emails sent to defense counsel, an action that the Judge found violated Chief Gallagher's Constitutional rights.

95.     As a result of Defendants' failure, Chief Gallagher was forced to spend thousands of additional dollars in legal fees along with additional time, travel, and expenses for his family for the extended time for trial resulting from the investigation into the leak and pursuant Constitutional violation.

## THIRD CAUSE OF ACTION: DEFAMATION

### (Against Defendant Philipps)

96.     Plaintiff repeats and realleges all of the allegations set forth above as if fully alleged herein.

97.     Defendant Philipps willfully, intentionally, and maliciously published numerous false statements about Chief Gallagher to the public.

98.     Defendant Philipps acted with reckless disregard for the truth and/or with the knowledge that the statements he made were false.

99.     Defendant Philipps failed to correct any of his publications or cease publishing defamatory content after counsel for Chief Gallagher brought the missing relevant facts and defamatory implications to his attention and informed defendant Philipps that he would be sued for defamation if he did amend and cease the defamatory publications.

100.    As a result of Defendant Philipps' false and defamatory statements, Chief Gallagher and his family have received graphic and disturbing death threats, including a message to his teenage daughter threatening "to rape her in front of her brother and then kill him, which have led to severe mental and emotional anguish.

101.    Defendant Philipp's false and defamatory statements have significantly tarnished Chief Gallagher's reputation and standing among his peers and in his community. As a result of Defendants' false and defamatory statements, Chief Gallagher has suffered significant adverse

36

effects, including significant mental and emotional anguish, being subject to ridicule and humiliation, receiving death threats to him and his family, including graphic messages sent to his teenage daughter such as one that read "Im [sic] gonna come rape you and slice your faggot brothers throat and make your youngest brother watch it all," being forced into the national spotlight in a negative light and subject to a continuing barrage of biasedly negative publicity, and significant tarnishing of his reputation.

102.    Chief Gallagher has suffered actual damages from Defendant's false and defamatory statements in the form of lost speaking engagements and employment opportunities, time and travel expenses to combat the false narrative created by Defendant Philipps, additional time away from work for his wife and travel expenses during the extended time for trial resulting from the "investigation" into the leaked information being disclosed by Defendant, the cost of therapy for Chief Gallagher's daughter, time and expense of counseling for the entire family, and the thousands of dollars expended in furtherance of this lawsuit to remedy and put an end to the continued damaging, intentionally defamatory and untrue statements of Defendant Philipps.

**FOURTH CAUSE OF ACTION: DEFAMATION BY IMPLICATION**

**(Against Defendant Philipps)**

103.    Plaintiff repeats and realleges all of the allegations set forth above as if fully alleged herein.

104.    Defendant Philipps willfully, intentionally, and maliciously published numerous articles that were intended to and reasonably understood to imply that Chief Gallagher was actually guilty of the crimes of which he was exonerated, painting him as a damaged and dangerous war veteran.

105.    Defendant Philipps acted with ill will toward Chief Gallagher and with reckless disregard for the truth and with the knowledge that the facts he presented were either false, or not the whole truth or an accurate portrayal of the truth.

106.    Defendant Philipps willfully, intentionally, and maliciously cherry-picked facts, evidence, and events to present to the public, while omitting information that was equally relevant but favorable to Chief Gallagher and contrary to the narrative he wanted to weave.

107.    Defendant Philipps willfully, intentionally and maliciously juxtaposed facts so as to imply a defamatory connection between them, contrary to what was actually proven in court.

108.    Defendant Philipps failed to correct any of his publications or cease publishing defamatory content after counsel for Chief Gallagher brought the missing relevant facts and defamatory implications to his attention and informed defendant Philipps that he would be sued for defamation if he did not make such changes.

109.    The intentionally defamatory statements of Defendant Philipps exposed Chief Gallagher and his family to hatred, ridicule, and contempt from those in his community, including by way of death threats to himself and family members and resulting in significant mental and emotional anguish.

110.    The intentionally defamatory statements of Defendant Philipps injured Chief Gallagher's reputation in the community, painting him as a criminal and murderer. As a result of Defendant Philipps' false and defamatory statements, Chief Gallagher has suffered significant adverse effects, including significant mental and emotional anguish, being subject to ridicule and humiliation, receiving death threats to him and his family, including graphic messages sent to his teenage daughter such as one that read "Im [sic] gonna come rape you and slice your faggot brothers throat and make your youngest brother watch it all," being forced into the national

spotlight in a negative light and subject to a continuing barrage of biasedly negative publicity, and significant tarnishing of his reputation.

111.    Chief Gallagher has suffered actual damages from Defendant's defamatory statements in the form of lost speaking engagements and employment opportunities, time and travel expenses to combat the false narrative created by the defendant, additional time away from work for his wife and travel expenses during the extended time for trial resulting from the "investigation" into the leaked information being disclosed by Defendant, the cost of therapy for Chief Gallagher's daughter, time and expense of counseling for the entire family, and the thousands of dollars expended in furtherance of this lawsuit to remedy and put an end to the continued damaging, intentionally defamatory statements of Defendant Philipps.

## FIFTH CAUSE OF ACTION: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (against Defendant David Philipps)

112.    Plaintiff repeats and realleges all of the allegations set forth above as if fully alleged herein.

113.    Defendant Philipps intentionally and recklessly published misleading and inaccurate information about Chief Gallagher, with reckless disregard for the truth.  Specifically, among other things and as alleged above, Defendant Philipps refused to change his story when informed of information showing that his relied-upon sources were false, and intentionally discouraged witnesses from cooperating with him to "verify" facts.

114.    Defendant Philipps' continued irresponsible journalism and unrelenting false portrayal of Chief Gallagher as a murderer and war criminal, contrary to the findings of a jury who had a *complete* picture of the evidence and after being confronted with the false information in his

"reporting," especially with the knowledge that Chief Gallagher and his family were receiving graphic and disturbing death threats as a result, was outrageous and beyond all bounds of decency.

115.   As a result of Defendant's intentional and reckless misleading and inaccurate journalism, Chief Gallagher suffered severe emotional distress that no reasonable person should have to suffer, including fear and anxiety for his family due to death threats and graphic harassment; the harm to his reputation; the constant negative, hateful, and threatening posts on social media; and the torture of being retried in the media for crimes of which he was exonerated after a full disclosure of the facts in court, and which he was attempting to put behind him.

WHEREFORE, Plaintiff demands judgment as follows:

A.  An award of compensatory and punitive damages as appropriate and determined at a jury trial;

B.  An award of the costs and disbursements of this action;

C.  Such other and further relief as this Court deems appropriate.

Dated: May 29, 2020
San Diego, California

Respectfully Submitted,

*Molly Shirer*

Molly Shirer, Esq.
Parlatore Law Group, LLP
*Attorneys for the Plaintiff*
2305 Historic Decatur Rd., Suite 100
San Diego, CA 92106
(212) 603-9918
Molly.shirer@parlatorelawgroup.com

Timothy C. Parlatore, Esq.
(pending *pro hac vice* admission)
timothy.parlatore@parlatorelawgroup.com

40